**ORIGINAL**

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
BID PROTEST

| | |
|---|---|
| PLANETSPACE INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 09- 99 C |
| | ) |
| THE UNITED STATES, | ) |
| | ) |
| Defendant, | ) |

FILED
FEB 1 8 2009
U.S. COURT OF
FEDERAL CLAIMS

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

PlanetSpace Inc. ("PlanetSpace"), by and through its undersigned counsel, files this complaint for declaratory and injunctive relief and alleges as follows:

## NATURE OF THE CASE

1. Plaintiff PlanetSpace brings this action to set aside and enjoin the decision by Defendant, the United States, acting by and through the National Aeronautics and Space Administration ("NASA" or "Government"), to override the mandatory stay imposed by the Competition in Contracting Act ("CICA"), 31 U.S.C. § 3553(d)(3)(A), when PlanetSpace filed a post-award bid protest with the U.S. Government Accountability Office ("GAO") challenging the Government's award of two contracts to Orbital Sciences Corporation ("OSC") and Space Exploration Technologies Corporation ("SpaceX") for International Space Station ("ISS") Commercial Resupply Services (the "CRS Contracts"). PlanetSpace brought its GAO protest on January 14, 2009. Nearly one month later, on February 9, 2009, NASA made its "Determination" to override the CICA stay.

## JURISDICTION AND STANDING

2. This Court has jurisdiction over this matter under 28 U.S.C. § 1491(b). See also Ramcor Servs. Group, Inc. v. United States, 185 F.3d 1286, 1290 (Fed. Cir. 1999); PGBA, LLC v. United States, 57 Fed. Cl. 655 (2003).

3. The remedies that PlanetSpace seeks are authorized by the Tucker Act, 28 U.S.C. § 1491(b)(1), and by the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02.

## PARTIES

4. Plaintiff PlanetSpace, headquartered in Chicago, Illinois, is an emerging space commercialization business focusing on the development of a broad spectrum of commercial space services that include cargo and crew to the ISS, point-to-point global travel, space tourism, and satellite orbital delivery.

5. Defendant is the United States of America, acting by and through NASA.

## FACTUAL BACKGROUND

### NASA's Involvement With The ISS

6. The ISS Program is an international partnership comprised of the United States, Russia, Canada, the members of the European Space Agency, and Japan. The ISS has been staffed since November 2000, and as of July 2006, 17 NASA Space Shuttle flights and 36 Russian "Progress" and "Soyuz" flights have been launched to assemble, maintain, and provide crew transportation and consumables.

401106719v2

7.      NASA currently plans to retire the Space Shuttle program in 2010, approximately six years before the scheduled retirement of the ISS in 2016.

8.      NASA has periodic requirements to carry supplies to and from the ISS. Presently, those requirements are met through the use of the Space Shuttle and through purchase of cargo delivery via the Russian "Progress" vehicle. Late in 2008, a Congressional enactment provided NASA with continuing authority, through 2016, to purchase services from Russia to deliver crew or cargo to the ISS. International partners also are to furnish means to resupply the ISS. The European Space Agency ("ESA") has developed and flown to the ISS the "Automated Transfer Vehicle" ("ATV"). The Japanese Aerospace Exploration Agency ("JAXA") is developing the H-II Transfer Vehicle ("HTV") and expects to conduct a flight test of the HTV in 2009. Between 2009 and 2015, ESA plans to launch at least five (5) flights of the ATV, about one per year, to resupply the ISS and JAXA also plans to launch at least five (5) flights of the HTV to resupply the ISS.

**NASA's Procurement Of Commercial Space Services Through COTS**

9.      For some years, NASA has sought to procure launch capability, to perform missions in low-earth orbit (as would include ISS resupply), from "commercial" providers in lieu of "government systems" which were developed and built for NASA or other U.S. Government agencies. To date, no "commercial" provider has demonstrated an "end-to-end" capability to perform a launch mission that would take cargo, as would be required for the ISS, to orbit. Nor has any "commercial" supplier successfully qualified or flown an "orbital transfer vehicle" as would be required to rendezvous and berth with the ISS for cargo resupply missions. The development of such a capability is a very complex, risky undertaking. Experience with the U.S.

spaceflight program is replete with examples of technical setbacks, schedule slippage and even launch attempt failures which can delay system availability for months if not years.

10.  Several years ago, NASA established a Commercial Crew and Cargo Program to stimulate the commercial space industry and facilitate private industry's demonstration of cargo and crew space transportation services, also known as the Commercial Orbital Transportation Services ("COTS") project.

11.  The COTS project entailed a two-phase approach, the first of which was a "period of development and demonstration" by private industry of their space transportation capabilities ("Phase 1"). The second phase ("Phase 2") would be a planned competitive procurement of orbital transportation services to resupply the ISS with cargo and crew, and is the same CRS procurement at issue in PlanetSpace's underlying GAO protest. Both SpaceX ($278 million) and OSC ($171 million) received COTS demonstration contracts in the form of NASA-funded Space Act Agreements.

12.  Under SpaceX's COTS demonstration contract, SpaceX receives milestone payments from NASA to develop and demonstrate vehicles, systems, and operations needed for SpaceX to perform earth to orbit space flight demonstration of (1) external cargo delivery and disposal, (2) internal cargo delivery and disposal, (3) internal cargo delivery and return to earth, and (4) crew transportation. At the present time, SpaceX has completed thirteen of twenty-two milestones under its COTS demonstration contract. It has neither attempted nor completed a successful launch of the "Falcon 9 launch vehicle" it proposes for the COTS demonstration flights and for use under the CRS contract. The Falcon 9 uses nine liquid-fueled "Merlin" engines designed and built by SpaceX. To date, SpaceX has attempted four launches of a

smaller launch vehicle, the Falcon 1, which uses one Merlin engine. Three of those attempts, including one in August 2008, resulted in failure. The fourth attempt, late in September 2008, successfully reached orbit but did not fly or separate a payload. SpaceX has not completed integration of the first nine-engine Falcon 9 launch vehicle. A fifth flight of the Falcon 1 is expected in March, 2009. The first flight of the Falcon 9 is not expected until the 2nd quarter, 2009 at the earliest. All of these activities are already funded under the COTS program. SpaceX, also using COTS funding, is developing a reusable orbital transfer vehicle, the "Dragon." The Dragon never has been flown on a launch vehicle or operated in space. SpaceX will receive COTS funding for that purpose as well, assuming it meets its contract milestones.

13.     Similarly, under OSC's COTS demonstration contract, OSC receives milestone payments from NASA to develop and demonstrate vehicles, systems, and operations needed for OSC to perform earth to orbit space flight demonstration of (1) external cargo delivery and disposal, and (2) internal cargo delivery and disposal. OSC is developing an entirely new rocket, the "Taurus II," and an entirely new orbital transfer vehicle, the "Cygnus." The Taurus II is the first rocket designed, developed or to be built by OSC which will use a liquid propulsion system for the primary, first stage. Taurus II is to employ two Russian built "AJ-26 engines," fueled by liquid oxygen and kerosene. The AJ-26 engines are modified "NK-33" engines originally developed (and built) – more than 35 years ago – for the Soviet Union's space program. The production line in Russia for those engines no longer exists. OSC first hopes to conduct a demonstration flight of the Taurus II and Cygnus in December, 2010.

14.     Both the SpaceX and OSC COTS demonstration contracts involve the development and operation of an end-to-end space transportation system of services including

ground operations and integration, launch, rendezvous, proximity operations, docking or berthing, orbital operations, reentry, and safe disposal or return.

15. As of December 2008, SpaceX has received $224 million of the $278 million funded for its Phase 1 COTS demonstration contract. As of November 2008, OSC has received $60 million of the $170 million funded for its Phase 1 COTS demonstration contract.

**The CRS Procurement**

16. NASA issued Solicitation No. NNJ08ZBG001R (the "Solicitation") on April 14, 2008, which sought proposals for a firm-fixed price, indefinite-delivery indefinite-quantity, commercial item contract or space transportation services to supply cargo to the ISS for a period of seven (7) years, from January 1, 2009 through December 31, 2015. The Solicitation stated that NASA may elect to award multiple-award contracts, and that the maximum value of each contract would be $3.1 billion. The Solicitation defined NASA's requirements for a contractor to provide resupply service to the ISS, dispose of unneeded cargo, and to return cargo from the ISS back to NASA. NASA amended the Solicitation several times, the final version of which was issued on June 17, 2008.

17. PlanetSpace timely submitted its offer in response to the Solicitation. On September 8, 2008, NASA notified PlanetSpace that NASA had included PlanetSpace's proposal in the competitive range. After conducting discussions, NASA invited PlanetSpace to submit a Final Proposal Revision, which revision PlanetSpace submitted on November 10, 2008. On December 23, 2008, NASA notified PlanetSpace that NASA had selected SpaceX and OSC for CRS contract awards.

**PlanetSpace's Bid Protest And Subsequent NASA Override**

18.     After NASA debriefed PlanetSpace on January 9, 2009, PlanetSpace protested the contract awards to SpaceX and OSC at the GAO on January 14, 2009. PlanetSpace asserts that NASA improperly selected OSC and SpaceX despite findings by the NASA Source Evaluation Board that, compared to OSC, the PlanetSpace proposal earned a higher ranking for "Mission Suitability and was substantially lower in price. Mission Suitability and Price were the only stated evaluation criteria in the RFP.

19.     NASA has announced publicly that it awarded a contract to OSC for $1.9 billion to deliver 20 Metric Tons ("MT") of pressurized cargo to the ISS between 2011 and 2015. PlanetSpace proposed to carry the same cargo volume, 20 MT, for $1.3 billion – more than $600 million less than OSC.

20.     Pursuant to CICA, NASA was directed to stay performance of the CRS contracts awarded to SpaceX and OSC. NASA initially suspended work under the protested contracts. Almost one month later, on February 9, 2009, NASA issued a "Determination to Continue Performance of International Space Station (ISS) Commercial Resupply Services (CRS) Contract after Receipt of Government Accountability Office (GAO) Protest" (the "Override Memo"). The Override Memo continued performance of the SpaceX and OSC CRS contracts and was signed by William P. McNally, NASA's Assistant Administrator of Procurement, and William H. Gerstenmaier, NASA's Head of Contracting Activity for the ISS Cargo Resupply. On February 10, 2009, NASA notified the GAO of its intent to authorize performance of the CRS contracts and to issue notices to proceed with performance to SpaceX and OSC.

401106719v2

**NASA's Override Memorandum**

21.     The Override Memorandum generally determined that "urgent and compelling circumstances exist that will significantly and adversely affect the interests of the U.S. unless the agency authorizes contract performance, notwithstanding the protest," and outlined several reasons for NASA's decision.

22.     First, the Memorandum states that a 100-day delay due to the automatic stay will result in a direct and adverse impact on the ability of SpaceX and OSC to meet their December 2010 and October 2011 launch dates, respectively. Activities allegedly impacted by a 100-day delay include detailed mission integration planning, development of software, development of qualification data, capital equipment and long-lead item purchases.

23.     Second, the Memorandum states that failure to meet the above launch dates will result in a failure to resupply the ISS with mission critical cargo and reduction of the ISS to a skeleton crew.

24.     Third, the Memorandum alleges that any delay in performance of the CRS contracts would mean that the United States will not be able to fulfill its international agreements and such a failure would adversely impact the future of further international space exploration initiatives.

25.     Fourth, the Memorandum states that no reasonable alternative sources exist to meet NASA's requirement to supply the ISS once the Space Shuttle is retired as a means for resupplying the ISS; the CRS contracts procure 40 MT of pressurized customer cargo and 8.3

401106719v2

MT of unpressurized usable cargo capacity, which together constitute 70 percent of the ISS cargo needs.

26.     Fifth, the Memorandum alleges that although NASA had previously used Russian vehicles to resupply the ISS as an alternative to the space shuttle, NASA does not currently have any agreements to use Russian vehicles for ISS resupply services. Moreover, the Memorandum states that use of Russian vehicles is not consistent with NASA's commitment to support domestic commercial space efforts and contrary to U.S. space policy.

27.     Sixth, the Memorandum states that proceeding with the override will result in the benefit of ensuring that the ISS timely receives cargo for its continued operation. By contrast, the Memorandum alleges that a sustained GAO protest would result in a potential termination liability of $20 million, which amount represents $10 million in funding through May 2009 each for SpaceX and OSC.

28.     Seventh, and last, the Memorandum concludes that the benefits of a stay override outweigh the impact of the override on the procurement process, and that the override will not eliminate PlanetSpace's opportunity to compete for the CRS contracts should the GAO recommend re-competition as corrective action in PlanetSpace's underlying protest.

**The Urgency Claimed by NASA is Illusory**

29.     The Override Memorandum asserts "urgency" which NASA claims to warrant removal of the GAO stay required by CICA. The GAO process contemplates a decision within 100 days of the filing of the protest. On the present schedule, that decision, on the CRS protest filed by PlanetSpace, would be received on or before April 24, 2009. NASA waited

approximately 26 days – more than one-quarter the statutory stay period – before asserting "urgent" grounds to lift the stay.

30. The original date for announcing the CRS award was November 28, 2008. NASA delayed the CRS announcement from November 28, 2008 to December 23, 2008. The Override Memorandum does not explain why NASA was apparently indifferent to the 25-day delay in the announcement of the CRS award, as in 2008 NASA did not assert that awardees would suffer a compressed production schedule or that initial cargo delivery to the ISS would be delayed – as now is claimed to justify the override.

31. Both SpaceX and OSC have substantial, and challenging, work to accomplish before they complete the COTS demonstration program – much less before they are ready to fly cargo to the ISS on CRS-funded launches. Under the "best case" scenario – with the wholly implausible premise that everything goes perfectly for both suppliers despite their lack of relevant experience or accomplishment – SpaceX will not be prepared to attempt a *demonstration* flight using its Dragon orbital vehicle until March 2010, thirteen (13) months from now, and OSC will not be ready for its attempt, using the Taurus II and Cygnus, until December 2010, twenty-two (22) months from now.

32. Considering the prerequisites for either SpaceX or OSC to be capable of an ISS resupply mission, and the fact that such missions cannot begin for several years – assuming all goes without a hitch – it is facially unreasonable for NASA to claim that the 74 days it will save, by pulling the CICA stay now, will make any difference in the real world ability of either SpaceX or OSC to supply the ISS.

33.     The Override Memorandum admits that the "possibility of an early launch vehicle failure" is "a common development vehicle problem" and that the possibility of "schedule delay is significant." Nothing in the Override Memorandum establishes that saving 74 days, through the override, will reduce the risks of these problems or mitigate their consequences. Moreover, nothing establishes that such problems, should they occur, can be resolved within 74 days, rather than a longer period. NASA's experience under the COTS program, with the same suppliers, indicates that 74 days is not a sufficient "buffer" for schedule risks. In April, 2008, reflecting development problems with the Falcon 1, SpaceX received a nine-month extension to the schedule for its COTS program requirements. Its third and final demonstration flight, under the COTS program, now is to occur in March 2010, six months later than initially set.

**OSC and SpaceX Continue To Receive Ample COTS Funding For CRS Endeavors**

34.     The Override Memorandum alleges that an automatic CICA stay will impact the ability of SpaceX and OSC to complete initial CRS planning activities and long-lead item purchases. However, SpaceX and OSC have already received hundreds of millions of dollars in COTS funding, and will continue to receive significant NASA funding, for Phase 1 efforts that either overlap with, or directly support, the Phase 2 CRS planning activities that are scheduled to occur during the pendency of PlanetSpace's GAO protest. By claiming that a delay of just over two months will impact the ability of either SpaceX or OSC to perform the CRS mission, NASA "conflates" the remaining obligations under the COTS contracts with the prospective requirements of CRS. In fact, neither SpaceX nor OSC have need for "new" CRS monies for the activities about which NASA professes concern – as this work already is required, and funded, under the COTS contracts. For example, under its COTS contract, OSC has received or will receive $30 million in February 2009. The first $20 million is for completion of a COTS

11

401106719v2

System Preliminary Design Review for the purpose of demonstrating to NASA that OSC's preliminary design meets all system requirements with acceptable risk, and establishing that OSC may proceed with its detailed design. The remaining $10 million is for completion of the Instrumentation Program & Command List. In March 2009, OSC will also receive a further $30 million under its COTS contract. The first $10 million is for completion of a Critical Design Review for its Unpressurized Cargo Module. The remaining $20 million is for completion of a Critical Design Review for its Demonstration Mission. In summary, over the remaining 22 months of OSC's present COTS contract, if it can perform all the milestones, it will receive total payments of $110 million.

35. The Taurus II launch vehicle and Cygnus orbital transfer vehicle that OSC is currently developing under its Phase 1 COTS contract constitute the same system components that OSC plans to utilize for its Phase 2 performance under the CRS contract. OSC is being paid, now, as it performs its COTS contract, to develop and demonstrate this system.

36. Similarly, under its COTS contract, SpaceX will receive $15 million in March 2009 to conduct a Demonstration Readiness Review that ensures SpaceX's demonstration flight hardware and software, ground facilities, end-to-end communication systems, support personnel, and procedures are ready for flight testing and data acquisition, reduction, and control. Before the COTS effort is complete, and assuming successful performance of each remaining milestone, SpaceX can expect to receive an additional $64 million over the next 13 months.

37. The Falcon 9 launch vehicle and Dragon orbital transfer vehicle that SpaceX is currently developing under its Phase 1 COTS contract constitute the same system components

401106719v2

that SpaceX plans to utilize for its Phase 2 performance under the CRS contract. SpaceX is being paid now, as it performs its COTS contract, to develop and demonstrate this system.

**NASA Recognizes That It Must Have Backup Options Due To Risks Of CRS**

38. Although the Override Memorandum contends that the continued viability of the ISS is dependent solely on the undisturbed performance of the CRS contract, NASA has publicly admitted on multiple occasions that CRS contains risks and delays in the project are inevitable. An extensive record of NASA pronouncements establishes that NASA, while it *hopes* that the COTS suppliers will succeed and prove their ability to resupply ISS, knows the *reality* that they may not and therefore has backup plans in place.

39. The NASA Authorization Act of 2005 required the International Space Station Independent Safety Task Force ("IISTF") to assess vulnerabilities of the ISS that could lead to its destruction, compromise the health of its crew, or necessitate its premature abandonment. The IISTF issued its Final Report in February 2007, offering recommendations that, if followed, "should strengthen the ISS Program by increasing the likelihood of mission success and mitigating risks to crew safety or health."

40. The IISTF's February 2007 report contains a section regarding the challenges associated with supporting the ISS after the planned Space Shuttle retirement in 2010. It listed three major "Non-Shuttle cargo vehicle capabilities": (1) the existing Russian Progress, (2) the new European ATV, and (3) the new Japanese HTV. The IISTF also listed "commercial crew/cargo resupply spacecraft, under NASA's COTS Program" among the additional cargo carrier possibilities.

41. The IISTF observed that "[d]esign, development, and certification of a new COTS capability are just beginning . . . [and] most likely will take much longer than expected and will cost more than anticipated." Thus, the IISTF recommended that the ISS Program "should not be required to commit the ISS to an unproven logistics support system such as COTS," and to "ensure that it is not forced into dependency on an unproven capability, the Program should procure additional spare proven capability to assure a smooth transition to unproven capabilities later. . . ."

42. In a similar vein, on April 24, 2008, the GAO's Director of Acquisition and Sourcing Management, Cristina T. Chaplain, testified before the House Committee on Science of Technology's Subcommittee on Space and Aeronautics regarding "Challenges in Completing and Sustaining the International Space Station."

43. Ms. Chaplain's testimony covered the various vehicle options that may be used to service the ISS after the planned Space Shuttle retirement in 2010, which options included COTS. Regarding COTS, Ms. Chaplain reported that NASA officials have acknowledged that their development schedules leave little room for the unexpected, and cited the February 2007 IISTF Final Report's observations in concluding that NASA's schedule for COTS is "optimistic" in comparison to other government and commercial space programs.

44. The admissions from NASA officials cited in the GAO report included testimony on July 24, 2007 before the House Committee on Science and Technology, where Tommy Holloway, former manager of the ISS Program for NASA's Johnson Space Center (and chairman of the IISTF) stated that "it would be unlikely that COTS will be able to provide a substantial part of the logistics program in the most critical period following retirement of the [space] shuttle

14

program." Mr. Holloway also expected that it would be "several years after that before routine commercial activities are viable."

45.     At the same hearing, William Gerstenmaier, the Source Selection Authority for the CRS procurement at issue in PlanetSpace's underlying GAO protest, and a signatory of the Override Memorandum, similarly admitted that NASA was not betting the future of the ISS on the success of COTS, and that NASA would take a multi-pronged approach to resupplying the ISS. Thus, although the Override Memorandum states that use of Russian vehicles is not consistent with NASA's commitment to support domestic commercial space efforts and contrary to U.S. space policy, Mr. Gerstenmaier has admitted that lining up agreements to use European, Japanese, and Russian resupply systems is a part of NASA's multi-pronged approach.

**The Availability of Several Other ISS Resupply Options**

46.     Although the Override Memorandum states that NASA does not currently have any agreements to use Russian vehicles for ISS resupply services, NASA has the legal authority to reach such agreements. Congress passed the Iran Non-Proliferation Act of 2000, which initially contained provisions that would place restrictions on NASA's ability to procure Progress and Soyuz ISS resupply services from Russia, but subsequently enacted an amendment in 2005 that extended the exemption for the ISS program from such restrictions through 2011. In September 2008, President Bush signed into law a provision that extended the Non-Proliferation Act exemption for Progress and Soyuz through 2016.

47.     In addition to the potential use of Russian resupply vehicles, as noted in both the February 2007 IISTF Final Report and April 2008 GAO testimony to Congress on the ISS, the European ATV and Japanese HTV are reasonable options available for ISS resupply.

401106719v2

48. Michael D. Griffin, NASA's most recent Administrator, has testified before the U.S. Senate Committee on Commerce, Science & Transportation, Subcommittee on Space, Aeronautics, and Related Sciences, on November 15, 2007, that "[a]pproaches to acquiring further [JAXA] HTV cargo delivery services, particularly in the area of non-pressurized system spares, are under evaluation in the event that COTS cargo services are delayed. If system sparing becomes critical to maintaining the station and U.S. commercial cargo services are delayed, it would be prudent to have the flexibility to execute a sound contingency plan."

49. Furthermore, NASA need not rely solely on COTS for resupplying the ISS if it were to postpone the planned 2010 retirement of the Space Shuttle. A NASA study conducted in early 2009 has already considered extending Space Shuttle operations either to 2012 or 2015. President Obama's White Paper on space policy during his campaign already recommends one additional space shuttle flight. Additionally, there is authorization and funding pending for two further flights – STS-133 and STS-134. As NASA has acknowledged, publicly and repeatedly, it has a variety of options available to it, and contingency plans, to resupply the ISS should there be delay in the availability of commercial resupply services. Actually, NASA has the ability to resupply the ISS throughout the period of its operation, as planned through 2015 or longer (if extended), without any use of commercial launch providers in the eventuality that COTS suppliers may fail. NASA, having recognized the unavoidable risks of commercial development of entirely new launch vehicles and orbital transfer vehicles, at no time "put all its eggs" in the basket of either COTS or CRS. Existing international partners can fill any gap, should it arise, and one or two additional Shuttle missions could be ordered by the new Administration.

50. As a matter of capacity, there are at least four different systems available to NASA to continue to support the ISS during the relevant period, should one or all of the COTS

401106719v2

or CRS suppliers be delayed or unavailable. The Shuttle, should its service life be extended, can carry 22.7 MT of cargo in a single flight. ESA's ATV can carry 7.7 MT of "upmass" cargo per flight. The figure for JAXA's HTV is 5.4 MT. Should NASA use its available statutory authority to contract with Russia for cargo resupply, the Progress vehicle can carry 2.4 MT. (NASA already intends to rely upon Russia's Soyuz vehicle for crew transport.) In fact, PlanetSpace offered an "interim" launch capability, as early as December 2011, of 5.5 MT "upmass," using the thoroughly proven Atlas V launch vehicle.

51.     That NASA has a preference not to use Russian vehicles for resupply is understandable and commendable, but as a legal matter there is no obstacle whatsoever to NASA entering into a contract with Russia for Progress resupply in time to avoid any "gap" in ISS in the near-term before COTS or CRS suppliers are likely to become available. NASA will need to depend on Russian vehicles regardless (i.e. for crew delivery) during the "gap" if the shuttle is not extended as the ISS CRS program is for cargo as is the ATV and HTV.

52.     The monies that NASA would spend, by prematurely providing funds to SpaceX and OSC under the CRS contract, absent a stay, could prove entirely wasted should one or both of those companies be found, after disposition of the PlanetSpace protest, not entitled to award, and should award instead be made to PlanetSpace.

53.     PlanetSpace and its principal subcontractors – ATK, Boeing and Lockheed Martin – expended great expense and effort in preparation and submittal of a CRS proposal. CICA's purpose of achieving "full and fair competition" will be offended if NASA's override is permitted to stand, as the COTS suppliers do not now need CRS money and NASA cannot establish any actual risk to ISS operations.

17

## CLAIMS FOR RELIEF

## COUNT I

### (Unlawful Override of CICA Stay)

54. PlanetSpace incorporates by reference all the preceding paragraphs.

55. NASA's decision to override the CICA stay is arbitrary, capricious, and not in accordance with law.

56. PlanetSpace has suffered injury and will continue to suffer injury because of the Government's arbitrary, capricious, and unlawful decision to override the stay of performance on the CRS Contracts. PlanetSpace has no adequate remedy at law for this injury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff PlanetSpace prays that this Court grant the following relief:

1. Enter a declaratory judgment holding that NASA's decision to override the CICA-mandated stay on the CRS Contracts is arbitrary, capricious, or otherwise not in accordance with law, setting it aside, and reinstating the CICA stay on the CRS Contracts *de jure*;

2. Issue a temporary restraining order prohibiting NASA from overriding the CICA stay of performance of the CRS Contracts or otherwise permitting OSC or SpaceX to commence or continue performing the contract;

3. Issue a preliminary injunction prohibiting NASA from overriding the CICA stay of performance of the CRS Contracts or otherwise permitting OSC or SpaceX to commence or continue performing the contract, until such time as the Court enters a final judgment on the merits of this action or the GAO has ruled on PlanetSpace's GAO bid protest;

401106719v2

4. Issue a permanent injunction prohibiting NASA from overriding the CICA stay of performance of the CRS Contracts or otherwise permitting OSC or SpaceX to commence or continue performing the contract, until such time as GAO has resolved PlanetSpace's bid protest;

5. Award PlanetSpace its costs, including reasonable attorneys' fees and expenses;

6. Grant PlanetSpace such other relief as the Court deems just and proper.

Dated: February 18, 2009

Respectfully submitted,

Of Counsel:

Jack Y. Chu
**PILLSBURY WINTHROP SHAW PITTMAN LLP**
1650 Tysons Boulevard
McLean, VA  22102-4859

Robert S. Metzger
**PILLSBURY WINTHROP SHAW PITTMAN LLP**
725 South Figueroa Street, Suite 2800
Los Angeles, CA 90017-5406
(213) 488-7437
(703) 749-2257 (protected facsimile)

Counsel for PlanetSpace Inc.

401106719v2